IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BANK OF AMERICA, N.A.,

    Plaintiff,

    v.

SEA-YA ENTERPRISES, LLC, CRAIG
H. WHEELER, and DANI D. WHEELER,

    Defendant.

C.A. 11-445-RGA

## MEMORANDUM OPINION

David B. Stratton, Esq., Wilmington, Delaware; James G. McMillan, Esq., Wilmington, Delaware; James H.S. Levine, Esq., Wilmington, Delaware; Attorneys for Plaintiff Bank of America N.A.

Kevin S. Mann, Esq., Wilmington, Delaware; Dennis R. Haber, Esq., Miami, Florida; Attorneys for Defendants Sea-Ya Enterprises, LLC, Craig H. Wheeler, and Dani D. Wheeler

July 3, 2012
Wilmington, Delaware

*[signature: Richard G. Andrews]*

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiff Bank of America, N.A. moves for summary judgment on its claim that Defendants Sea-Ya Enterprises, LLC, Craig H. Wheeler, and Dani D. Wheeler owe the deficiency on a breached loan agreement to finance a Gulfstream Aircraft (the "Aircraft"). (D.I. 29). Defendants move to amend their answer to the complaint. (D.I. 27). Craig Wheeler executed a Commercial Aircraft Note on behalf of Sea-Ya Enterprises in favor of MBNA America, N.A. for the principal amount of $6,148,666.01 on June 5, 2004. (D.I. 31, A55-59). Craig and Dani Wheeler co-signed the Note in their personal capacities. *Id.* Craig Wheeler also executed a Security Agreement that gave the Bank a security interest in the Aircraft. *Id.* at A60-66. Upon default, the Note provides that MBNA America has the right to repossess and sell the Aircraft and hold Defendants liable for any deficiency balance. *Id.* at A58 §22. An event of default includes the "failure to make any payment when due." *Id.* at A57 §21(b). The Note also requires Defendants to pay reasonable attorney's fees incurred by the Bank for collection. *Id.* at A57 §22. The Security Agreement further provides that Sea-Ya would be liable for costs associated with repossessing, repairing, and reselling the Aircraft. *Id.* at A65 §13(e). On January 1, 2006, MBNA was acquired by Bank of America, and Bank of America assumed MBNA's rights under the loan documents. (D.I. 1 ¶ 19).

Defendants decided to put the Aircraft on the market in either late 2007 or early 2008. (D.I. 31, A12). Defendants hired Wyatt Stedman, an aviation consultant, to assist them in marketing the Aircraft for sale. *Id.* at A12. In 2008, Mr. Stedman received two offers to purchase the Aircraft, one for $8.5 million and one for $7.8 million. *Id.* at A20. Both were rejected by Craig Wheeler. *Id.* The market for jets over twenty years old apparently

2

then underwent a serious decline. *Id.* at A43. Defendants stopped making payments on the Note in October 2010 (*id.* at A1), and informed the Bank that they lacked the financial ability to make the account current via a letter dated December 29, 2010. *Id.* at A1-4. The letter also indicated that Defendants received one tentative offer for the Aircraft in November 2010 for $650,000, which was withdrawn after the discovery of a problem with the right wing plank. *Id.* at A2. The Aircraft was not airworthy at that time. *Id.* A plane that is not airworthy cannot legally be flown within the United States. *Id.* at A36. The letter listed six other maintenance and repair issues that would require a total cost of $1,779,000 to fix in the near future. *Id.* at A1-2. Defendants sent two further letters indicating a willingness to facilitate the Bank's repossession of the Aircraft and to resolve the debt on favorable terms. *Id.* at A73-74, A82-84.

The Bank repossessed the Aircraft, notifying Sea-Ya Enterprises and Craig Wheeler via a February 9, 2011 letter that it intended to sell the Aircraft at a private sale. *Id.* at A75-76. The Bank retained Principal Aviation Group to inspect and evaluate the Aircraft. Principal concluded that the cost to return it to flyable condition for use within the United States would not be economically feasible. (D.I. 30, p.8, citing D.I. 31, A68-72, A77-78). The Bank received three offers for the Aircraft (D.I. 31, A79), and in June 2011, sold it in a private sale to the highest of the three foreign bidders for $400,000, less fees and expenses. (D.I. 30, p.9).

Bank of America moves for summary judgment on its claim that Defendants are in default of the Note[1] and are liable for the deficiency owed. The Bank relies, in part, on three letters from Defendants' counsel, arguing that they are admissions that Defendants were in default and that the Bank was justified in repossessing the Aircraft and selling it at private sale.

---

[1] That the defendants were in default has never really been at issue. In the Defendants' Answer, they admitted that they had made no payments since September 2010. (D.I. 7, ¶¶ 25 & 39). In Affidavits submitted with the Answer, each defendant admitted that the defendant does "not deny that [the defendant] has defaulted under the Note." (D.I. 7-1, ¶ 2; 7-2, ¶2; 7-3, ¶2).

3

"There is ample authority for the proposition that an attorney's statements may bind the party whom the attorney represents." *In re Joy Global, Inc.*, 346 B.R. 659, 665 (D. Del. 2006). Defendants contest the Bank's use of these letters, arguing that they are "offers to compromise" and thus not admissible to prove liability under Federal Rule of Evidence 408. Rule 408 only excludes admissions that reflect an actual dispute, or at least an apparent difference of view, between the parties concerning the validity or amount of a claim. *See Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir. 1995). All three of the letters are conciliatory and reflect the desire to expedite a mutually agreeable satisfaction of the debt, but they do not reflect a genuine dispute or even disagreement concerning the fact of default, the Bank's right to repossession, or the amount of deficiency. For example, the initial letter, dated December 29, 2010, does not contest the legitimacy of the loan agreement, admitting that "the loan was guaranteed by Mr. and Mrs. Wheeler." (D.I. 31, p. A1). This letter further admits that Defendants stopped making payments after October 2010 and could not afford to continue making payments:

> Until October 2010, the payments on the note were timely made…As we advised you over the telephone, neither Sea-Ya Enterprises nor the Wheelers are able to continue making the monthly payments on the above-referenced loan. Based on the current financial circumstances of both entities, neither Sea-Ya nor the Wheelers have the ability to repay the note secured by the Gulf Stream Aircraft.

*Id.* Defendants did not contest they were in default of their obligations. Nothing in this letter properly falls within the ambit of Rule 408.

The second letter is dated January 20, 2011. *Id.* at A82. This letter reiterated the Defendants' inability to pay, addressed third party liens placed against the aircraft, provided information of the Defendants' assets, and detailed the Defendants' unsuccessful attempts to sell the Aircraft. *Id.* at A82-84. At no point does it suggest any facts inconsistent with Defendants

4

being in default of the loan obligations or the Bank's rights to a complete satisfaction of the debt. This letter is not excluded by Rule 408.

The third letter is dated February 4, 2011. Although Defendants now contest the legitimacy of the repossession, this letter suggests complete acknowledgment of the Bank's right to retake the Aircraft. This letter also recognized a "likely substantial shortfall between the current market value of the aircraft and the amount of the loan." *Id.* at A73. Defendants then offered two properties to the bank. *Id.* at A74. Defendants expressed the hope that, in exchange for these properties, the Bank would consider the debt satisfied. *Id.* This third letter, unlike the first two, explicitly labels itself as an "offer in good faith as a compromise and settlement of the loan," (*id.*), apparently in an attempt to invoke the protection of Rule 408. The inclusion of this sentence, however, does not transform the substance of the letter into something expressing actual dispute or disagreement over the underlying claim; the letter is more of a plea for mercy than a protest of the Bank's right to satisfaction. For these reasons, the Court holds that the letters do not fall under the protection of Rule 408 and the Bank may use factual admissions contained within them to establish its claim.

The three letters prove that Defendants are in default. The first admit that no payments were made after October 2010; the third offers to facilitate the Bank's repossession. Defendants offer no contradictory evidence that they have met their loan obligations. Therefore, it is undisputed that Defendants are in default under both the Note and the Security Agreement. *Id.* at A57 §21; A64 §12. This default triggered the Bank's right to repossess and sell the Aircraft. *Id.* at A58 §22; A64 §12.[4]

---

[4] The Bank argues that two other independent grounds for default occurred. First, Defendants were required to maintain the Aircraft so that it was "airworthy," i.e., comply with governmental requirements so that it may legally fly in the United States. *Id.* at A62 §9(J)(i). Second, any material change in the Defendants' financial condition triggered default. *Id.* at 57 § 21. The first letter from Defendants' counsel

5

Defendants argue that, even if they are in default, the Bank failed to provide them with proper notice of the sale of the Aircraft under the loan documents, and they are thus excused from the obligation to pay the loan deficiency. California law controls the legality of the Bank's repossession and resale of the Aircraft. *Id.* at A65 §14(c). The Security Agreement has a notice paragraph, providing, "Bank will advise Debtor in its Notice of Resale how Bank plans to advertise the resale and what kind of repair, maintenance or make ready service it will perform prior to offering the Aircraft for resale." *Id.* at A64, §13(b)(x). Defendants argue that the Bank's "Notice of our Plan to sell Property" did not contain information regarding the repair, maintenance, or make ready service, thus breaching the Security Agreement and excusing them from liability on the deficiency. *Id.* at A75-76. The Bank, however, did not contend that any such work was done to the Aircraft, nor does it request recompense for any work performed. *Id.* at A76; (D.I. 1). There was nothing to notify Defendants about. Assuming for the sake of argument that the Bank should have explicitly notified Defendants of the lack of work it would do on the Aircraft, the Bank's failure to do so cannot be said to have harmed or prejudiced Defendants in any way. At most, it is an immaterial breach of the contract, if it can be considered a breach at all. *Linden Partners v. Wilshire Linden Associates*, 62 Cal. App. 4th 508, 532 (1998) (In determining materiality of a breach, the court should ask "was the breach a substantial factor in causing plaintiffs to be damaged?"). The Defendants are not excused from the deficiency on this basis.

Defendants further argue that the Bank failed to notice Dani Wheeler, thus rendering the notice ineffective and excusing all Defendants from their obligation to pay the deficiency. California law requires the secured party to send an authenticated notification of disposition to

---

admitted that the Aircraft was not "airworthy" and admitted that Defendants had suffered serious financial setbacks since entering into the loan agreement. *Id.* at A1-A3. Thus, the Bank's argument is correct.

the debtor and any secondary obligors. Cal. Com. Code § 9611. A secured creditor is barred from obtaining a deficiency judgment in the event it fails to give notice of sale of collateral. *In re Parsons*, 124 B.R. 818, 819 (Bankr. S.D. Cal. 1991). California courts hold that the "[r]ight to deficiency judgment is conditional and depends on strict compliance with statutory requirements regarding notice and sale of collateral." *Earl of Loveless, Inc. v. Gabele*, 2 Cal. App. 4th 27, 34 (Cal. Ct. App. 1991).

The Bank sent its "Notice of our Plan to Sell Property" to the Wheelers' home address, which also serves as the principal place of business for Sea-Ya Enterprises. *Id.* at A75. The Notice itself, however, was only addressed to Sea-Ya Enterprises and Craig Wheeler; Dani Wheeler's name was omitted. Defendants' position is that Dani Wheeler's exclusion excuses all Defendants from obligations on the deficiency. Considering that Dani Wheeler is married to and lives with Craig Wheeler, it is exceedingly unlikely that she did not have actual notice of the Bank's plan to resell the Aircraft. Nevertheless, California law takes a very strict approach to the notice requirements of § 9611(c). The Bank's failure to explicitly notice Dani Wheeler frees her from personal liability on the deficiency. It does not follow, however, that the other Defendants are therefore also excused. Sea-Ya Enterprises and Craig Wheeler were in fact properly noticed. Notice being flawed to one Defendant should not excuse the properly noticed Defendants from their contractual obligations. Defendants Sea-Ya Enterprises and Craig Wheeler may not avoid summary judgment on the deficiency on this basis.

Defendants further contend that they are excused from paying the deficiency because the Bank failed to notify the Defendants how and where it planned to conduct the resale of the Aircraft. The Bank, however, included within the Notice that it intended to sell the Aircraft at a "private sale sometime after 3/1/2011." *Id.* at A75. This complied with California Commercial

7

Code §9613, which required the Bank to notify the Defendants of the type of sale, i.e., public or private.[5] Because the sale was a private sale, the Bank then only needed to state the time after which the sale was to be made, which it did. *Id.* The Bank's notice satisfied these requirements.

Defendants next argue that the Bank failed to adequately mitigate its damages by selling the Aircraft for less than its fair market value. California Commercial Code §9610 states that a secured creditor must sell the collateral in a commercially reasonable matter. Whether a sale is conducted in a commercially reasonable manner is a question of fact, and the answer depends on all of the circumstances existing at the time of the sale. *Ford & Vlahos v. ITT Commercial Finance Corp.*, 8 Cal. 4th 1220, 1235 (Cal. 1994). The fact that another form of sale might have yielded a higher purchase price does not alone show that a sale was not commercially reasonable.[6] A disposition of collateral is made in a commercially reasonable matter if the disposition satisfies any of the following conditions: (1) it is made in the usual manner on any recognized market; (2) it is made at the price current in any recognized market at the time of disposition; or (3) it is made otherwise in conformity with reasonable commercial practices

---

[5] California Commercial Code §9613 states:

Except in a consumer-goods transaction, the following rules apply:

(1) The contents of a notification of disposition are sufficient if the notification does all of the following:
(A) It describes the debtor and the secured party.
(B) It describes the collateral that is the subject of the intended disposition.
(C) It states the method of intended disposition.
(D) It states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting.
(E) It states the time and place of a public disposition or the time after which any other disposition is to be made.

[6] "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." Cal. Com. Code § 9627(a).

8

among dealers in that type of property that was subject of the disposition. Cal. Com. Code § 9627.

The record shows that the Bank employed Principal Aviation Group to sell the Aircraft. (D.I. 31, A79-81; D.I. 33, p.16). The Bank states that Principal Aviation Group performed an inspection and evaluation of the Aircraft, determining that it would require $520,000 in repairs to return it to flyable condition through August 31, 2011, at which point another $325,000 to $625,000 in engine repairs would be required. (D.I. 30, p.13; D.I. 31, A77-78). Principal Aviation Group then marketed the Aircraft over four months (D.I. 33, p.16) and received three offers in the amounts of $315,000, $360,000 and $400,000. (D.I. 31, A79-81). The Bank accepted the $400,000 offer. (D.I. 33, p. 16). Although the Bank provided little further evidence detailing its efforts in marketing the Aircraft, Defendants' own failed efforts to attract buyers provide the necessary context to judge the commercial reasonableness of the sale. Defendants had employed Wyatt Stedman to broker the Aircraft in 2008. Mr. Stedman received offers in excess of the principal loan amount in early 2008, both of which were rejected by Defendant Craig Wheeler. *Id.* at A20. After 2008, the market for jets over 20-25 years old suffered a severe decline. *Id.* at A43. Subsequently, the Wheelers only received one tentative offer for $650,000. *Id.* at A1. This offer was apparently withdrawn after the discovery of the right wing plank corrosion on the Aircraft. *Id.* It was determined that the Aircraft required repairs in the amount of $1,779,000.00 as of March 2011, apparently further hampering the marketability of the Aircraft. (D.I. 7, ¶ 22). Mr. Stedman continued marketing the Aircraft without success, even after it was repossessed and sold by the Bank, through November 2011. *Id.* at A43.

These facts are sufficient to show that the Bank's sale was commercially reasonable. The Bank used the Principal Aviation Group, a company apparently dedicated to the Aircraft trade, to

market the Aircraft. Principal Aviation Group was able to find three willing buyers, despite the down market, the Aircraft's serious mechanical issues, Defendants' own admissions that the Aircraft was not "airworthy," and the determination that the Aircraft could not be legally flown in the United States market.[7] When contrasted with Defendants' own failure to attract buyers at any price, the Bank achieved a favorable result. This suggests commercial reasonability. Defendants attempt to dispute the Bank's argument with various listings of planes for sale and a "market analysis," but nothing is offered that explains whether the listings are of planes in an equivalently degraded condition as the Aircraft. (D.I. 34, pp. 1-7). Defendants finally argue that the "stage III hush kits" equipped on the Aircraft alone could have been sold for more than $400,000, based on the deposition testimony of Mr. Stedman. (D.I. 33, A41). Mr. Stedman, however, admitted that he had no personal experience in the marketing of used hush kits. *Id.* at A41. He further provided no evidence of such sales actually occurring. There is no foundation for his opinion, and his opinion cannot contradict the Bank's evidence that it sold the Aircraft in a commercial reasonably manner. The Court holds that the Bank complied with California Commercial Code §9610 in marketing and selling the Aircraft.

Defendants' final argument is that they are excused from paying the deficiency because an unidentified agent of the Bank told Craig Wheeler that if he made the July 2010 payment, the Bank would defer three monthly payments and work with Defendants to informally resolve the matter. According to the Defendants, the Bank cannot now claim that the Defendants breached the loan documents after excusing performance. Defendants ignore California Civil Code §1698, which excludes oral modification of a written contract when the contract contains an

---

[7] Defendant Craig Wheeler offers an affidavit that states, "The Defendants had maintenance performed prior to the repossession and the Aircraft was airworthy at that time, minus an issue with the wing plank that could have been resolved." (D.I. 35, p.1).

10

express provision requiring modification to be in writing. Both the Note and the Security Agreement have such provisions. The Note states, "[n]o modification, change, waiver or amendment to this Note shall be deemed made by Bank unless in writing signed by Bank, and each such waiver, if any, shall apply only to the specific instance involved." *Id.* at A58 §27. The Security Agreement's equivalent subsection states, "Neither this Agreement nor any of its provisions may be changed, waived or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver or discharge is sought." *Id.* at A66 §19. These subsections make any oral modification ineffective. Further, the evidence shows that the Bank did not repossess the Aircraft until February 2011, meaning that even if the modification was valid, the Bank did not take adverse action against the Defendants until long after the supposed three month grace period ended. Finally, Defendants can make no arguments of waiver, estoppel, or reliance, as Defendants' letters show that they were in frequent communication with the Bank, knew that the Bank intended on exercising its rights under the agreement, and wished to facilitate the Bank's repossession of the Aircraft. For these reasons, the Court rules that the Defendants are not excused from performance based on any oral representations.

The Bank has proven that Defendants defaulted on their loan obligations. The repossession and sale of the Aircraft was conducted in a commercially reasonable manner. Defendants Sea-Ya Enterprises and Craig Wheeler received notice in compliance with California law. The Bank has established its deficiency claim against those two Defendants. Defendant Dani Wheeler, however, was never explicitly noticed and is therefore personally excused from her debt on the loan deficiency. For these reasons, the Court grants the Bank's motion for

11

summary judgment against Defendants Sea-Ya Enterprises and Craig Wheeler, but denies the motion for summary judgment against Defendant Dani Wheeler.

The Court must also address Defendants' Second Motion for Leave to Amend Answer to Complaint. (D.I. 27). Defendants' proposed amended answer includes a counterclaim for "breach of implied duty of good faith and fair dealings"and a claim for "breach of contract."

The Court denies leave to amend the claim for breach of the implied duty of good faith and fair dealing. Defendants allege that the Bank stated that if the July 2010 payment was made, the Bank would defer three monthly payments and "work with" Defendants to informally resolve the dispute. The allegation is contradicted by the record showing that the Defendants made the monthly payments until October 2010. (D.I. 31, p. A1). If the Defendants thought that the monthly payments were deferred, they would not have made them. Thus, allowing this claim would be futile.

The proposed breach of contract claim is premised on allegations that the Court has rejected in granting summary judgment, with one exception. Dani Wheeler claims breach of contract in that the Bank failed to provide her with notice of the resale. (Proposed Counterclaim ¶ 23(a)). While the damages she claims appear fanciful, the breach might provide her with a defense to the deficiency judgment.

Thus, leave for Dani Wheeler to amend the answer to allege breach of contract will be allowed. In all other respects, the Defendants are denied leave to amend the answer.

An appropriate order will follow.

12